UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PAUL JORGENSON,

        Plaintiff,

   v.

RICHARD B. HAAK, M.D., et al.,

        Defendants.

Case No. 1:17-cv-00817-NONE-EPG (PC)

FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS BE GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S BATTERY CLAIMS

(ECF NOS. 29 & 46)

OBJECTIONS, IF ANY, DUE WITHIN TWENTY-ONE DAYS

## I.    BACKGROUND

Paul Jorgenson ("Plaintiff") is a federal prisoner proceeding *pro se* and *in forma pauperis* in this action. This case now proceeds on Plaintiff's Second Amended Complaint ("SAC"), which was filed on July 12, 2018. (ECF No. 19). This case is proceeding on Plaintiff's state tort claims for medical negligence against Defendants Haak, Randhawa, and Emanuel Medical Center ("Defendants"), and his state tort claims for battery against Defendants Haak and Emanuel Medical Center. (ECF No. 21, p. 2; ECF No. 95, p. 3; ECF No. 104, p. 2; ECF No. 105, p. 2).

On December 17, 2018, defendant Emanuel Medical Center ("EMC") and defendant Jaspal Randhawa ("Randhawa") filed a partial motion to dismiss. (ECF Nos. 29, 30, & 31). On February 7, 2019, Plaintiff filed his opposition to defendants EMC and Randhawa's motion to dismiss. (ECF No. 58). Defendants EMC and Randhawa filed their reply on February 14, 2019. (ECF No. 60).

On January 17, 2019, defendant Haak filed a partial motion to dismiss. (ECF No. 46).

1

On February 7, 2019, Plaintiff filed his opposition to defendant Haak's motion to dismiss. (ECF No. 57).  Defendant Haak filed his reply on February 12, 2019. (ECF No. 59).

The portions of the motions to dismiss regarding the issue of Plaintiff's consent to the medical procedures he underwent at Emanuel Medical Center were converted to motions for summary judgment, and discovery was opened as to this issue.  (ECF Nos. 70 and 74).  On June 24, 2019, Plaintiff filed his supplemental response.  (ECF No. 78).  On July 17, 2019, defendant Haak filed his reply to Plaintiff's supplemental response.  (ECF No. 81).  On July 25, 2019, defendants EMC and Randhawa filed their reply to Plaintiff's supplemental response. (ECF No. 82).

The motions to dismiss have been ruled on.  (ECF Nos. 95 & 96).  Now before the Court are Defendants' motions for summary judgment on the issue of whether Plaintiff consented to the medical procedures he underwent at Emanuel Medical Center.  For the reasons that follow, the Court finds that there is no genuine dispute of material fact regarding Plaintiff's consent to the procedures prior to receiving medication or other treatment.  Therefore, the Court will recommend that summary judgment be granted to defendants Haak, Randhawa, and Emanuel Medical Center on Plaintiff's battery claims.[1]

## II.    SUMMARY OF PLAINTIFF'S SECOND AMENDED COMPLAINT

At approximately 8:00 a.m. on the morning of November 21, 2016, four U.S.P. Atwater correctional officers arrived at Plaintiff's cell and informed him that he was going on a medical trip.  Plaintiff told the officer in charge that he had not requested any medical treatment either verbally or in written form, and that he had a right to refuse non-emergency medical treatment. Nevertheless, Plaintiff was placed in leg shackles, as well as hand-cuffs secured with a "black box" and waist chain, and then taken to Emanuel Hospital Center.  The restraints were never completely removed during the course of Plaintiff's hospital stay.

---

[1] The battery claim against defendant Randhawa was previously dismissed because "Plaintiff failed to sufficiently allege that defendant Randhawa did an act that resulted in harmful or offensive touching…."  (ECF No. 91, p. 10; ECF No. 95).  However, given that there is no genuine dispute of material fact regarding Plaintiff's consent to the procedures, the Court will recommend that defendant Randhawa be granted summary judgment on the battery claim as well.

These four unknown correctional officers were the staff that provided security at the Emanuel Hospital Center, and were charged with guarding Plaintiff at Emanuel Medical Center from November 21 to November 23, 2016. Plaintiff was kept chained hand and foot to the hospital bed. The four officers also kept the television set at the highest volume during Plaintiff's entire stay at the hospital. This high volume subjected Plaintiff to sleep deprivation.

After arriving at the Emanuel Medical Center on November 21, at approximately 10:00 a.m., Plaintiff was ordered to sign some "preliminary paperwork" by the guards and Emanuel Medical Center staff. Plaintiff again advised the officer in charge that he had not requested any medical treatment and also informed the Emanuel Medical Center staff that he had a right to refuse non-emergency medical treatment.

Plaintiff was then placed supine in a CT scanner. After CT localization of a portion in the right hepatic lobe of the liver for the biopsy was obtained, a lidocaine anesthetic was administered and a 19-gauge guide needle was advanced into the right hepatic lobe. 20-gauge lung core samples were obtained and placed in a preservative solution for later examination. The procedure was negligently performed due to staff inattention and in wanton disregard of Plaintiff's requests to refuse treatment. Plaintiff suffered an immediate pneumothorax and collapse of his right lung.

At the CT procedure, the attending physician was defendant Richard B. Haak, M.D., and defendant Jaspal Randhawa was the technologist. Other personnel were involved, but Plaintiff does not know their names.

A right pleural chest tube was implanted and introduced into the right pleural cavity. Plaintiff experienced immediate dizziness, nausea, and impaired breathing. He was admitted as an "in patient" and placed in a bed in a secure ward. Plaintiff was chained to the bed for three days. He was placed on an external suction machine as a means to inflate his right lung. He was given pain medications, but they were ineffective and he continued to experience substantial pain and anxiety during his stay.

By late afternoon of November 23, 2016, all medical intubations were removed and Plaintiff was returned to the penitentiary. Plaintiff did not give his consent for a livery biopsy,

a collapsed lung, the intubation of the external suction machine, or being chained to the bed.

## III.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### a.    Legal Standards

#### i.    *Summary Judgment*

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Albino v. Baca ("Albino II"), 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record… from which a reasonable inference… may be drawn…"; the court need not entertain inferences that are unsupported by fact. Celotex, 477 U.S. at 330 n. 2 (citation omitted). Additionally, "[t]he evidence of the non-movant is to be believed…." Anderson, 477 U.S. at 255. Moreover, the Court must liberally construe Plaintiff's filings because he is a prisoner proceeding *pro se* in this action. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

ii. *Battery*

"A claim based on lack of informed consent—which sounds in negligence—arises when the doctor performs a procedure without first adequately disclosing the risks and alternatives. In contrast, a battery is an intentional tort that occurs when a doctor performs a procedure without obtaining any consent." Saxena v. Goffney, 159 Cal. App. 4th 316, 324 (2008).

Under California civil law, the elements of a battery are: "(1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, loss or harm to the plaintiff." Tekle v. United States, 511 F.3d 839, 855 (9th Cir. 2007). Accord Piedra v. Dugan, 123 Cal. App. 4th 1483, 1495 (2004).

b. Issue

The sole issue before the Court is whether Plaintiff consented to the medical procedures he underwent at Emanuel Medical Center prior to receiving medication or other treatment.

c. Plaintiff's Position

Plaintiff argues that he did not consent to the medical procedures. In support of his

position, Plaintiff submits his declaration, in which he states that he "did not ever give verbal authorization for a liver biopsy and [he] did not knowingly sign any agreement to have a liver biopsy." (ECF No. 57, p. 6, ¶ 5). Plaintiff asserts that Correctional Officer RM initialed and signed the Consent to Medical and Surgical Procedures form. (ECF No. 78, p. 2). In support of this assertion Plaintiff cites to "EMC's Initial Disclosures, Bates 48 through 51." (Id.). Plaintiff also summarizes the records. (Id. at 4).

Plaintiff also refers to (and summarizes) medical records that he asserts show that he was under the influence of drugs (id. at 4), and asserts that, "[a]s a result of Jorgenson's reactions to the drugs, and the collapsed lung, Jorgenson became disoriented and was not able to fully understand or comprehend what was taking place at the time." (Id. at 2).

Finally, in a declaration, Plaintiff alleges that, after his lung collapsed, "a nurse excitedly told [him] that [he] <u>must</u> sign a form, otherwise EMC could not treat [him] for the medical emergency that had just occurred. Again, [he] was medicated, in pain, chained hand and foot, and signed this form under duress. This is #104 in EMC's initial disclosure of documents and is dated 11/21/16, time 9:30." (Id. at 5, ¶ 5) (emphasis in original).

    d.  <u>Defendants' Position</u>

Defendants argue that Plaintiff consented to the medical procedures he underwent at Emanuel Medical Center prior to receiving medication or other treatment. In support of their position, Defendants submit the following evidence:

    1.  The declaration of defendant Haak, in which defendant Haak alleges that:

        a.  "Prior to the procedure, [he] performed a short History and Physical of the patient, and confirmed that informed consent was discussed with the patient, including the risks, benefits, potential complications, and alternative options. [He] also confirmed that written consent was obtained from the patient prior to the procedure, and that the patient's signed written consent was present in the patient's medical chart." (ECF No. 81-1, pgs. 1-2, ¶ 2) (citation omitted).

        b.  The procedure began at 10:50 a.m. on November 21, 2016. (Id. at p. 2, ¶

2).

    c.   "Mr. JORGENSON did not, at any time before or during the procedure, indicate to [defendant Haak] that he withdrew his consent to the liver biopsy." (Id. at p. 2, ¶ 4).

    d.   "During the procedure, Mr. JORGENSON experienced a pneumothorax, which is a known complication of the procedure and an emergency situation requiring the placement of a chest tube." (Id. at p. 3, ¶ 5).

    e.   "After observing the pneumothorax enlarging on CT imaging, I immediately implanted a chest tube and configured it over the lung apex, all of which was in response to an emergency situation undertaken to protect the health and life of the patient and within the scope of the consent provided prior to the procedure." (Id.).

2. A consent form with the signature "Paul Jorgenson," which states it was signed on "11/21/16," at "0930." (ECF No. 81-1, p. 8). "S. Shaw RN" is listed as the witness. (Id.). The form states:

> The hospital maintains personnel and facilities to assist your/the patient's physician and surgeons in their performance of various surgical operations and other special diagnostic or therapeutic procedures. These operations and procedures may all involve risks of unsuccessful results, complications, injury, or even death, from both known and unforseen [sic] causes, and no warranty or guarantee is made as to result or cure. You have the right to be informed of such risks as well as the nature of the operation or procedure; the expected benefits or effects of such operation or procedure; and the available alternative methods of treatment and their risks and benefits. Except in cases of emergency, operations or procedures are not performed until you have had the opportunity to receive this information and have given your consent. You have the right to consent or to refuse any proposed operation or procedure any time prior to its performance.

> You/the patient's physician's and surgeons have recommended the operations or procedures set forth below. Upon your authorization and consent, the operations or procedures set forth below, together with any different or further procedures which in the opinion of the supervising physician or surgeon may be

indicated due to any emergency, will be performed on you/the patient….

…

Your signature below constitutes your acknowledgment (1) that you have read and agree to the foregoing: (2) that the operation or procedure set forth below has been adequately explained to you by the above-named physician or surgeon and by your/the patient's anesthesiologist and that you have received all of the information you desire concerning such operation or procedure; and (3) that you authorize and consent to the performance of the operation and procedure.

Operation or Procedure: COMPUTED TOMOGRAPHY OR ULTRASOUND GUIDED LIVER BIOPSY WITH PROCEDURAL SEDATION.

(ECF No. 81-1, p. 8).

3. Medical records related to Plaintiff's hospitalization at Emanuel Medical Center from November 21, 2016, to November 23, 2016. (ECF No. 82-1, pgs. 6-118).

4. The transcript of the scheduling conference that was held on March 20, 2019. (Id. at 120-167).

5. The declaration of Samantha Shaw, a registered nurse who works at Emanuel Medical Center. (ECF No. 82-2, p. 1). Samantha Shaw alleges the following:

   a. Samantha Shaw witnessed Plaintiff sign the consent form dated November 21, 2016. (Id. at p. 2, ¶ 3).

   b. Samantha Shaw signed the consent form as a witness. (Id. at ¶ 4).

   c. "It is [Shaw's] custom and practice to go over the consent with the patient. [She] go[es] over what the document is for and what the procedure is. [She] ask[s] the patient if they had an opportunity to discuss with their physician beforehand, and if they are comfortable signing the consent and moving forward with the surgery. If the patient asks any questions or raises any concerns or suspicion that they do not understand the procedure or that they do not want to proceed with the

surgery, [she] will immediately contact the doctor to come meet with the patient to answer any questions and discuss the procedure further to determine if the procedure will go forward or not." (Id. at ¶ 5).

    d.   "In this case, Plaintiff never indicated that he did not want to sign the consent. Plaintiff never indicated that he did not understand the procedure or that he was unwilling to proceed with the procedure. Plaintiff had no questions or concerns about the procedure. Plaintiff's actions and words provided no indications that he did not understand the procedure or that he did not want to proceed with the procedure." (Id. at ¶ 6).

    e.   "Plaintiff did not appear to be in any distress and Plaintiff freely signed the consent in front of [Shaw]." (Id. at ¶ 7).

    f.   [Shaw] did not force the plaintiff to sign the consent. [Shaw] did not witness anyone else force, threaten, or otherwise pressure Plaintiff to sign the consent.

    e.  <u>Analysis</u>

    There Court finds that there is no genuine fact regarding Plaintiff's consent to the procedures prior to receiving medication or other treatment. The evidence shows that Plaintiff signed a form consenting to the biopsy, as well as "any different or further procedures which in the opinion of the supervising physician or surgeon may be indicated due to any emergency" (ECF No. 81-1, p. 8), prior to the procedures and prior to being medicated. Plaintiff's evidence to the contrary is insufficient to create a genuine dispute of material fact.

    Plaintiff's version of events regarding the consent form has changed throughout the course of this litigation.

    In his SAC, Plaintiff alleges that he "did not give his consent for a liver biopsy…." (ECF No. 19, p. 5). At the scheduling conference (during which the Court and the parties discussed the motions to dismiss), Plaintiff admitted that he signed a consent form, but alleged that he signed it under duress because the officers guarding him threatened him. Transcript of

Scheduling Conference Held on March 20, 2019, 4:5-5:4.[2]

In his supplemental response, which was filed approximately three months after the scheduling conference was held, Plaintiff does not mention threats from the officers guarding him. Instead, Plaintiff asserts that an officer (Correctional Officer RM) initialed and signed a consent form on Plaintiff's behalf. He also asserts that, as to the consent form that he did sign, he only signed under duress, and due to intimidation and coercion. Plaintiff asserts that he was forced to sign the consent form after he was already medicated and after his lung had already collapsed, because EMC would not treat the collapsed lung unless he signed.

As to Plaintiff's first assertion, that Correctional Officer RM initialed and signed a consent form for him, Plaintiff appears to be correct that a correctional officer signed and initialed a form that, among other things, included language about informed consent. (ECF No. 82-1, pgs. 53-56).[3] However, this form also dealt with financial obligations regarding the procedures, and has no bearing on whether Plaintiff separately signed a form consenting to the procedures (which he did).

As to Plaintiff's second assertion, that he was forced to sign a consent form after he was already medicated and after and his lung had already collapsed, Plaintiff's uncontroverted medical records show that this assertion is not true.

According to Plaintiff's medical records, the consent form was signed at "0930" (9:30 a.m.). (ECF No. 81-1, p. 8).[4] This means that Plaintiff signed the consent form before he was brought to the CT scanner, which occurred at 10:50 a.m. (ECF No. 82-1, p. 29). It was around this time that Plaintiff received Fentanyl. (Id. at 22, 29, & 59). The procedure started at 11:12 a.m. (Id. at 29).[5] Plaintiff's lung collapsed at 11:20 a.m. (Id.). Dilaudid was not ordered until

---

[2] Plaintiff also admitted that he did not tell anyone that he did not want to sign the form. Transcript of Scheduling Conference, 5:24-6:3.
[3] Plaintiff only cites to "EMC's Initial Disclosures, Bates 48 through 51." (ECF No. 78, p. 2). However, defendants EMC and Randhawa provided a copy of the records. (ECF No. 82-1, pgs. 53-56).
[4] Plaintiff refers to this consent form in his supplemental response, and notes that the form states that it was signed at 9:30. (ECF No. 78, p. 5, ¶ 5). Plaintiff does not dispute that he signed the form at 9:30.
[5] According to the declaration of defendant Haak, the procedure began at 10:50 a.m. (ECF No. 81-1, p. 2, ¶ 2). While there is a discrepancy between the medical records and defendant Haak's declaration, it is a minor one, and whether the procedure began at 10:50 a.m. or 11:12 a.m. makes no difference to the Court's analysis.

10:00 p.m. (Id. at 21).

In addition to the medical records that indicate Plaintiff consented to the procedures prior to receiving medication or other treatment, Defendants submitted the declaration of Samantha Shaw, a nurse at Emanuel Medical Center, who alleges that she witnessed Plaintiff sign the consent form. (ECF No. 82-2, p. 2, ¶ 3). She further alleges that "Plaintiff did not appear to be in any distress and Plaintiff freely signed the consent in front of me." (Id. at ¶ 7). Finally, she alleges that she "did not force the plaintiff to sign the consent. [She also] did not witness anyone else force, threaten, or otherwise pressure Plaintiff to sign the consent." (Id. at ¶ 8).

Additionally, Defendants submitted the declaration of defendant Haak, who alleges that, "[p]rior to the procedure, [he] performed a short History and Physical of the patient, and confirmed that informed consent was discussed with the patient, including the risks, benefits, potential complications, and alternative options. [He] also confirmed that written consent was obtained from the patient prior to the procedure, and that the patient's signed written consent was present in the patient's medical chart." (ECF No. 81-1, pgs. 1-2, ¶ 2) (citation omitted).

It is true that Plaintiff, in his declaration, claims that he signed the consent form after he was already medicated and after and his lung had already collapsed. However, Plaintiff did not challenge the accuracy of his medical records, and in fact relied on them in his supplemental response. Additionally, Plaintiff did not provide any evidence showing that he received medication or treatment prior to 9:30 a.m.[6]

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). See also F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997) ("A conclusory, self-serving affidavit, lacking detailed

---

[6] Plaintiff refers to a medical record that he argues shows that he received Fentanyl at 8:12 a.m. However, the record is a form entitled "PHYSICIAN'S ORDERS." (ECF No. 82-1, p. 22). This form appears to state that Fentanyl was ordered at 8:12 a.m. (Id.). There is no indication on the form that Plaintiff was given Fentanyl at 8:12 a.m. In fact, it appears to state that Plaintiff was given Fentanyl at 10:55. (Id.).

facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")

Here, Defendants provided not only a declaration from a defendant stating that Plaintiff consented before the procedure began, but also medical records that directly contradict Plaintiff's version of events and a declaration from a non-party nurse stating that Plaintiff was not pressured to sign the consent form. Plaintiff provided only his own declaration, in which he does not challenge the accuracy of his medical records or explain why his medical records contradict his version of events.

Moreover, as mentioned above, Plaintiff's version of events regarding the consent form has changed throughout the course of this litigation. In his SAC, which is signed under penalty of perjury, Plaintiff alleges that he "did not give his consent for a liver biopsy…." (ECF No. 19, p. 5). Plaintiff does allege that he was ordered to sign some "'preliminary paperwork' by the Officer-in-Charge of the Four Unknown Correction Officers and Emanuel Medical Center Staff," but there is no mention of a consent form or threats. (Id. at 4). Additionally, the "preliminary paperwork" was signed prior to the start of the procedure. (Id.).

At the scheduling conference, and after being provided with a copy of a signed consent form, Plaintiff's story changed. Plaintiff admitted that he signed a consent form, but alleged that he signed it under duress because the officers guarding him threatened him. Transcript of Scheduling Conference Held on March 20, 2019, 4:5-5:4.

Apparently realizing that this was not a winning argument, when it came time to file his supplemental response, his story changed again. Now, Plaintiff alleges that it was not the guards who forced him to sign the consent form, but medical staff. Plaintiff alleges that he was forced to sign the consent form after he was already medicated and after his lung had already collapsed, because EMC would not treat the collapsed lung unless he signed.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. This sham affidavit rule prevents a party who has been examined at length on deposition from rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact…. But the

sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment. In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." <u>Yeager v. Bowlin</u>, 693 F.3d 1076, 1080 (9th Cir. 2012) (citations and internal quotation marks omitted) (first alteration in original).

A declaration may be considered "to be a sham when it contains facts that the affiant previously testified he could not remember." (<u>Id.</u>). However, "newly-remembered facts, or new facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham…. [T]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit." (<u>Id.</u> at 1081).

While Plaintiff is not contradicting prior deposition testimony, he is contradicting his sworn pleading and statements he made in court. Despite having the opportunity to do so, Plaintiff has provided no explanation as to why his version of events has changed throughout the course of this litigation. Thus, the Court finds that the version of events in Plaintiff's declaration in support of his supplemental response is a sham and should be disregarded.

As Plaintiff's evidence is directly contradicted by the record, and as the version of events included in Plaintiff's declaration in support of his supplement response should be disregarded, there is no genuine dispute of material fact regarding Plaintiff's consent to the procedures prior to receiving medication or other treatment. As lack of consent is a necessary element of a battery claim, the Court will recommend that summary judgment be granted to defendants Haak, Randhawa, and Emanuel Medical Center on Plaintiff's battery claims.

## IV.    RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants be granted summary judgment on Plaintiff's battery claims.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven (7) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**February 10, 2020**__          /s/ Erica P. Grosjean
                                  UNITED STATES MAGISTRATE JUDGE